Good morning, Your Honors. My colleague that was supposed to argue this brief couldn't make it, so you're stuck with me with my bad accent. Your accent is just fine. Can you move the mic a little closer? Sure. And if you could then state your name for the record, please. Luis Guerra. Okay, thank you. Your Honor, we ask the Court to reverse and amend the Qualified Immunity Summary Judgment on behalf of the officers and the city. This is nothing more than a factually disputed event that occurred on June 4, 2012, in Phoenix, Arizona, on a park specifically designed for disabled individuals. This young man had mental problems. He had a t-ball bat in his hands and had been banging stuff around the park. That's it. And the bat was metal, I believe. A metal bat. If you listen to the tape, the tape is very clear. It's a defendant's exhibit. It's a recording by the dispatch of the Phoenix PD of the entire event. It's about five minutes long, but the shooting itself, when the officers get to the scene, is about 20 seconds. The defendants enhanced that audio with an expert. There is no evidence that according to that audio by the Phoenix PD, the evidence proves scientifically that before this young man was shot, he threw the bat on the ground 11 seconds before. That's the evidence. Conclusively, there is no other evidence on that audio. Now, the defendants try to come with explanations why it's not there, but it's not there. All that's there is that young man at about five minutes, 11 seconds on that tape, after the officers say words to the effect, put the bat on the ground, he throws the bat on the ground. And because it's metal and the park is cement, you can hear it clearly. It clatters for quite a long time. The defendant's expert marks it on their report. It's on the record. Bat thrown out. But the testimony from the other side, which may or may not be believed, is that he picked it back up again. Factual dispute. Factual dispute. But let's imagine that for a second. Let's imagine that for a second. That's not on the audio. What is on the audio at 511 is down on the ground. Move to the microphone, please. Down. You're not in front of a jury. I apologize. I get excited. I'm Latino. I apologize. I've been accused of being passionate, but I think it's code word for something else. I'm an idiot. It's okay. So, this is what the officers say. Three times starting at 511. Down on the ground. Down on the ground. Down on the ground. And less than a second after the last down on the ground, five shots are fired. Four in the chest. One in the head. Now, why is that important? Because the audio picked all of that. All of that. So, if the officers allegedly would be saying stop, why would they be talking over each other? Certainly, that officer that was saying down on the ground was being picked up. Didn't Randy Johnson, and we should make clear for the record this is not the former baseball pitcher. No, it's not. But he was an individual who encountered Mr. O'Brien and, in fact, was the person who made the 911 call and I guess left his phone on while this entire thing was happening. Wasn't, isn't his version of events that O'Brien did indeed put the bat down, but then he picked it back up and advanced on the officers? True. That's what he says. But several points, Your Honor. First, I would like to reserve time to respond at the end. I apologize. I didn't say that. About three minutes, if I could. Second, Mr. Johnson, he called 911 and he says that the events occurred that way, but we have an audio recording. See, that's a factual dispute. The audio recording shows if Mr. O'Brien threw the bat on the ground and then picked it up again, we could hear something. Certainly, the officers would say, besides stop, the officers would have said, what are you doing? Don't touch that. Don't go there. Don't pick it up. Nothing. Nothing. All you have, here we are making suppositions and conflicting accounts of the events, one by an eyewitness that had axed to grind, because if you look, listen to the entire tape, he says that young man is threatening him and his kids. He didn't. He never threatened anybody. He banged with a t-ball bat. Well, we've got at least four eyewitnesses, do we not? We have the two officers. We have Mr. Randy Johnson. We have Mr. Randy Johnson's son. And then we have officer. Officer Todd. Right. So what your argument is, because there are inconsistencies or witnesses who didn't see things that other witnesses say occurred, a jury's going to have to sort out who's able to accurately recount what happened. Absolutely. I mean, that's your position. Factual dispute. But Officer Todd is very important, because Officer Todd, I question him, and you can look at ER 343 to 353, very detailed, in addition to an interview that was done by the police that night. And he says, I have an obscured view of the shooting. The man has no bat. He has no bat falling. And he was, what, 135 feet away at the time, and the decedent was dressed in black, and the bat was black. Is that true? That's what he said. Possibly. I don't know about all the details. Remember? No, no. You took his deposition. You don't remember what he said. I did. I don't remember all the details on the bat. That's all I'm saying. Well, isn't that kind of significant? I mean, a jury might think, given the similarity in color, that the decedent may have, in fact, had a small black metal bat that the officer couldn't see from his vantage point 135 feet away. No, no, no. I asked him all those questions. He never raised that issue. And when did the fiancé tell him? I'm not saying he's telling the truth. I'm just suggesting to you that a jury is going to have to decide which of the eyewitnesses to the crime was in the best position to see what happened. That's right. But it's still a factual dispute. I'm not arguing with you. But my point is. He may actually be trying to help you, Counsel. Thank you so much, Your Honor. Isn't it correct that every witness, Johnson, Todd, the officers involved in the shooting, probably not Johnson's son, because I believe he ran and hid when the difficulties broke out. But isn't it correct that every witness who had an ability to observe said that when O'Brien was on the ground face down, the bat was underneath his chest? Yes. If he threw it away, how did it get under his chest? If he was walking. Microphone, microphone. Yeah, I'm sorry. If he was walking. But again, Your Honor, we're trying to make suppositions of what happened. But if he was walking without bat in the hands, just walking. When he was shot, he could certainly have fallen on top of the bat, right? But here we are deciding factual disputes. That's all we've been doing here, deciding factual disputes. That's not for the judge to decide. And if I can go back to the point of Officer Todd, and I understand what Judge Tolman was doing. Like he said to the private attorney, I was trying to give you a soft pitch. You're swinging at the bleachers. I get that. I apologize. It amazes me how many times counsel do that. I mean, they assume every question we ask is a hostile question. I'm sorry. And it's not. So my point was, if you look at the question, Officer Todd never says he didn't see it. And the question was not, was it probable? It's the classic role of a jury to decide whether a witness was in a proper position in order to see and hear everything he says he saw and heard. That's right. Absolutely. Now, one of the things that's troublesome for the other side is that at least Officer Tiger, in a deposition, says that he instructed Mr. O'Brien to drop the bat. And he instructed him several times to drop the bat. And that is not heard on the tape. The other side says, well, but that's because maybe it was too far away or whatever. What's your response to that? Or whatever argument they're making as to why it was said but not picked up, what's your response to that? Your Honor, I can certainly say several things. First, that audio, the naked audio by the police, it's not there. The enhanced audio, it's not there. Of course, it's just a self-serving allegation by a police officer that killed a man. I mean, but the reality is that is just explanations of the inexistence of the evidence. This is just a conflict between or a dispute, a factual dispute of what happened. And the gentleman that certainly could clarify that is dead, right? So we need to go with the other forensic or scientific evidence. And the only forensic scientific evidence that exists of what happened is that video, that audio. I apologize. That audio from the 9-1-1. Well, that's not totally true. I mean, I guess it depends on what your definition of forensic evidence is. But I would say that the bat underneath the body of Mr. O'Brien is forensic evidence corroborating, to some extent, the testimony of the officers that he had not completely relinquished control or custody over the bat, as they were ordering him to do on arrival. One sentence I disagree with. I mean, I agree that's forensic evidence. But when I asked the CSI, Eaton, that did the investigation for the police department, crime scene investigator, is there any evidence based upon your entire investigation of the scene that he was holding the bat at the time of the shooting? He said no. Well, he clearly had possession of it at some point prior to that. Of course. Did he not? Of course. So what forensic evidence other than DNA on the handle of the bat would you be looking for that would be available for discovery by a forensic crime scene technician? Certainly blood evidence. Okay. There might be some blood. The splatter of the blood. There is blood on the bat, but he laid on top of it when he died. But that doesn't answer the question as to whether or not he retrieved the bat after he's heard throwing it down to the ground. Your Honor, if he's doing something that is against what the police officers are saying, the police officers would make commands that don't do that. Don't reach for it. Don't go for it. Counsel, this whole thing happened in 77 seconds. I understand. And your argument here is that they could have said more than they said before they started shooting. But, you know, if you're telling me that this whole thing went down literally in a matter of seconds, you know, a jury is going to have to decide whether the officers acted reasonably or not in believing that their lives were in danger or that the lives of others were in danger. At this stage, you should view the evidence in the light more favorable to my client. I am viewing the evidence in the light more favorable, but you're suggesting to me that just because it's on the tape, it couldn't possibly have happened. No, no, no. The problem is there are some things that the witnesses say happened that I wouldn't expect to hear on an oral audio tape from the cell phone of Mr. Randy Johnson that was recorded in the 911 center. If you listen to the tape, Your Honor, you can clearly hear. We have listened to the tape. But my point is, Your Honor, it's nothing but a factual dispute. We go back to that. It's just a factual dispute. I have not argued with you at all about that. I think we got the point that it's a factual dispute, as you would have us understand it. Let's have you save some time. Thank you so much, Your Honor. And let's hear from the other side. Thank you so much. And we're okay with your passion.  That's okay. Good morning, Your Honors. May it please the Court. My name is Lori Burke, and I represent the City of Phoenix and Officer Conklin. My co-counsel, Sally Odegaard, represents the estate of Officer Tiger, but I am here to argue on behalf of all of them. Can we get right down to this? Absolutely. There's a dispute as to whether O'Brien threw the bat down and was not advancing toward the officers, and that the officers had told him at least twice, stop, don't advance, when the shooting occurred. That's one possibility. The other possibility is that he threw the bat aside, and he was not so instructed, and he didn't have the bat in his hand when he was shot. And the factual dispute, it seems to me, gets down to two things. One, Officer Todd, who in his initial statement said, I didn't see O'Brien with a bat. He said, he could have had one, but I didn't see one. And the fact that in the 11th second gap in the tape, there is not a second command to stop, don't advance, whatever the words might have been, which your clients said was said. And everything else can be heard. Other people talking, clanking of the bat, whatever. Why isn't that enough to send this back to a trial before a jury? Sure. Your Honor, so... And if I said anything wrong in that description, you correct me, please. Sure. The commands to drop the bat were given before he dropped the bat. You can hear yelling in the background that sounds like it's a police officer from far, far away. And you have not only Kyle Johnson, Randy Johnson, and both officers saying that they gave multiple commands to drop the bat, but Kirsten Hillhouse, the lifeguard who didn't see anything because she was on a lifeguard chair and her back was to them, also heard the commands to drop the bat. Now, let me ask you this. Are you saying that the commands to drop the bat took place before he dropped it the first time or they took place after he picked it up on your view of the evidence? Well, my view of the evidence is that it was stated at both times, but it doesn't matter whether it was said second time. Because as I read what the officers are testifying to, they said drop the bat after he picked it up. Well, both. Yes. Right. I understand that they said drop the bat the first time around. He does drop the bat. Their contention is that he picks the bat up again, at which point they shoot him after having told him to drop it. My problem is, although we denied the motion to play the tape here into the courtroom, all three of us have listened to the tape probably several times. Probably not as many as us. Probably not. And what happens on the tape is actually, it's very clear. I mean, and I hear them very clearly saying get down on the ground. Right. And that's enough, Your Honor. Excuse me. Sure. It's a very short interval. If they had actually said drop the bat after he picked it up again, I find it inconceivable that we would not have heard that because we're hearing them say other words, get down on the ground. That strikes me as presenting a jury question at a minimum as to whether or not they said drop the bat. And if they didn't say drop the bat and they claim they said drop the bat, then the jury is able to begin to be skeptical of the general story. So why shouldn't this go to the jury? Your Honor, that is not a material, factual dispute as to whether they ---- But you see, your whole case hinges upon, in terms of whether or not there's excessive force, whether he had a bat in his hand. If he has no bat in his hand and he's standing there, even though he's a fairly large man, the shooting takes place awfully quickly, you're in trouble. If he has a bat in his hand, I think your officers have a very good defense. So the case really hinges on did he pick the bat up again. So I think this is very material. What I said isn't a material, factual dispute is whether the command was given to drop the bat. You hear them saying get on the ground, get down on the ground, get down on the ground three times. He doesn't comply with that. So let's look at the facts about whether he was advancing with the bat. Well, but you see, take my point, and I understand that it's an uncomfortable point and you don't want to agree with me. The officers say he picked up the bat again. We told him to drop the bat. There's no evidence on the tape that they told him to drop the bat. If the jury says the officers are making that up, making up the part about drop the bat, the jury might well then infer, you know, he really didn't pick up the bat and the officers are making this up. How do we respond? How do you respond to that? Again, Your Honor, can I walk you? Every eyewitness who saw the incident said that he was advancing with them on the bat. Not every eyewitness. There's the guy in the parking lot who says I didn't see a bat. Okay, let's walk through Officer Todd's testimony very carefully. Okay, but every eyewitness, that's not true. It is true, Your Honor. Officer Todd was getting out of his patrol vehicle as the first shots, multiple, he says shots, were fired. If you go to Supplemental Excerpt of Record 568, he testified that he did, I'm sorry, if you go to Supplemental Excerpt of Record 575, he states that as he exited his patrol vehicle, he heard shots being fired. So he's not seeing anything yet. He then looked toward the sound of the shots, same SCR, Supplemental Excerpt of Record 575. He says the first time he saw Timothy O'Brien, he was already going down. The testimony from both Randy Johnson and Kyle Johnson is that after Timothy O'Brien had been shot, he continued advancing toward the officer. So he had been shot multiple times before he went down. So what that means is that the first time Officer Todd is seeing Timothy O'Brien, he has been shot multiple times. I thought Officer Todd said that the first thing he observed was the officers advancing on O'Brien. Am I wrong about that? What he observed, he looked at the officers and I don't recall him saying that they were still advancing. But I don't think that matters. Kyle Johnson testified. This is SCR 379. Kyle Johnson testified that Timothy O'Brien, quote, kind of dropped the bat in the position while he was getting shot but was still holding it. So, again, it's now down low and Officer Todd is asked. But that statement by Johnson is clearly inconsistent with what we hear on the tape. There is a very loud, almost continuous clattering. We hear the bat go down. There's no dispute that Timothy O'Brien dropped the bat. But the point is he picked it back up and advanced on the officers. And Officer Todd also very clearly testified that he ran toward the area where this incident occurred. He had his eyes on both officers the entire time and he had his eye on Timothy O'Brien. When he reached the body, the bat was underneath Timothy O'Brien. Timothy O'Brien dropped the bat under the ramada. That is undisputed. Timothy O'Brien is 26 feet from the ramada at the time he shot and goes down. So it is impossible for the bat to have been underneath Timothy O'Brien when he was shot unless he had been holding onto it. So he was clearly in possession of the bat at the time he was shot. It's physically impossible for the bat to have gotten from underneath the ramada where he dropped it to where he ended up going down on the ground unless he had possession of it. There's no other explanation for how the bat got there. Officer Todd was very clear that he watched everything. Nobody touched Timothy O'Brien. Nobody put anything underneath him. And he said he would have seen that if it happened. And so I'll move on to the fact that you can't hear Timothy O'Brien pick up the bat. Well, that's not something that would be associated with the noise. Okay, so I can move on from that. Yeah, I'm with you on that one. Okay. And the Ryan Eaton issue, he testified at his deposition that it wasn't part of his job responsibility to make a determination as to whether there was a bat in Timothy O'Brien's hand at the time. He was there to take pictures, measurements, impound evidence, that kind of thing. He didn't analyze the evidence. So he's just the crime scene investigator. He's just a crime scene investigator. He comes out in tags and bags. Tags and bags. That's all he's doing. He's not assessing or evaluating the evidence. You can't get around the fact that both Timothy O'Brien and the bat were underneath the Ramada at the time he dropped the bat. And at the time he shot, he's 40 feet from there or 26 feet from there. How did he get there? He was advancing toward the officers. And how did the bat get there? The bat was in his hands. That's the only possible explanation. And as you know, Officer Todd testified that it's very possible that O'Brien had the bat. The bat was black. That's shown in the photographs. And I don't know if Your Honors know where that photograph is. I did note it. And Mike Kuzel, the biomechanical expert, cites to published studies that talk about the fact that someone can be in possession of something and it not be seen from that kind of a distance. Well, this bat isn't very big, right? It's a t-ball bat. It's a metal t-ball bat. So it's, what, maybe 16, 18 inches long? Yes. Doesn't make it any less deadly than a regular baseball bat. I'm not suggesting it cannot be a dangerous weapon. Right. But, yeah, so that's another reason he may not have seen it. But your point is that it's small enough that depending on the angle that Todd was, he might not have been able to see that he was holding it on the other side of the body that he couldn't see. Correct. And, I mean, his testimony is very clear. But why, I'm still kind of with Judge Fletcher, why are these not all disputed issues surrounding the key fact here, which was, was O'Brien threatening the officers with the bat at the time that they both simultaneously fired? There's no evidence to refute that. Well, there is some testimony from Todd who says he could see everything clearly and he never saw a bat. Again, Officer Todd did not see the events that led up to the shooting. Officer Todd didn't see anything. Your point is that he didn't really start observing until after he heard shots. After there had been multiple shots. Correct. So he does not establish, he cannot establish whether the bat was or was not in Timothy O'Brien's hands at the time the officers made the decision to shoot and shot their guns initially. He said he was getting out of his vehicle, at that time he heard multiple shots, he looked in that direction, he looked at the officers first, and then he saw Timothy O'Brien as he's going down. And what's the time, I assume that there is a computer time stamp. Did Officer Todd announce by radio his arrival at the scene? Yes, he did. How much time elapses between his arrival and the shooting? He does announce that and it is in the record, but I can't remember as I stand here right now, but it's definitely part of the record on appeal as to when he arrived there. I know this is an established fact, I just don't know the answer. Can you tell us how long the bat was? I mean, I've dealt with, I've coached softball, t-ball, and so on, so I have some sense of t-ball bats, but do we know how long this t-ball bat was? Your Honor, I don't recall the exact measurement, but both officers perceived it was a regular bat. Kyle Johnson thought it was a Louisville Slugger regular bat. So I know that doesn't help you. I don't have the exact measurement, but it was long enough. Didn't the homicide investigator measure it? I mean, they usually do. They took a picture of it, right? I'm sure, and I wish I had that in the record. The length of a regular bat, a regular t-ball. It didn't get into the record for the summary judgment motion. I wish it would have. A regular t-ball bat is about 32 inches. So all we have is a photograph, but there's no ruler next to it to see how long it is. Right. So I apologize for that. I'm not sure how material that is, but my guess is. It's a regular t-ball bat. It's skinny. It's not fat, but it's about as long as a regular bat. Right, and there's no dispute here that Timothy O'Brien knew these were police officers. The evidence is abundantly clear. Randy Johnson told him he was calling the police. He saw the police. He said he's going to, and his intention, he said, I am going to hit them, too. That clearly shows his intention, and that's not in dispute. Thank you, Your Honors. Okay. Thank you very much. You saved some time. First, there's on the record explanation why the bat would be moved. Mr. Kyle Johnson testified that he saw the police officers kicking the bat after the shooting, so it could be an explanation why the bat was moved. It's on the record, Your Honor. Second, there was no warning that they were going to shoot this young man. There was no use of alternative level of force. We are assuming that he picked up the bat. The evidence does not show that. They decided, according to the record that I quoted by Officer Tiger and Officer Conklin, they decided to use guns before any contact. You're saying there's no witness? Well, the two officers, I guess, testified that he picked the bat back up, but did any of the civilian witnesses testify that they saw him pick it back up? I think Mr. Johnson testified that, Randy Johnson. So there are witnesses who testified that they saw him pick it back up. Randy Johnson, the initial person that caused the call. So there's three witnesses, the two officers. Sure, sure. And Johnson, who's the civilian witness. So what is it specifically that Randy Johnson said about them picking a bat up? Do you have the exact language? No, I don't. But I can tell you, Your Honor, Randy Johnson is a real troubled man with a really troubled past. Okay, but now you're getting into cross-examination. No, no, no, I'm not going to go do that. Yeah, you are. No, no, I'm not. Okay. So listen to the five minutes on the tape. Your Honor, we are assuming this is the most intrusive violation on the Fourth Amendment, killing of a life. So let's be specific about what the evidence shows or not. Counsel, we're trying to be very specific. I understand. If you haven't discerned that in 40 minutes of questioning, you haven't been listening to anything. No, no, no, I apologize, Your Honor. I get excited. We take these cases very seriously. Here's my point, Your Honor. Here's my point, Your Honor. So we have a young man that for five minutes is recorded on the tape. The only threat that you will listen on that tape for the five minutes is Randy Johnson threatening to shoot Tim between the eyes. Tim did a lot of things, but he certainly didn't touch anybody, didn't hurt anybody, didn't hit anybody. Was there no other testimony by anybody in and around the pool that O'Brien had been threatening any of the children? That all comes from Randy Johnson. My understanding, yes, because he initially went in there into the pool and he was told that he could not swim, so he came out and started banging by the ramada. But he didn't – I mean, it's crystal clear by both officers that their understanding was that he didn't hurt, hit, or injure anyone before he got there. But the testimony of Officer Todd on page 343 of the record, so you observed the officer shooting. Yes. Correct. At no time did you see or observe anything on Mr. O'Brien's hands. At no time do you observe anything on Mr. O'Brien's hands during the shooting. And I ask at any time. When I went up to him, I noticed a bat underneath him. I'm asking in his hands. No. At no time do you observe Mr. O'Brien's – anything in Mr. O'Brien's hands. No. Also, again, Your Honor, on page 352 of the record, you told the officers that you saw both officers shooting. Correct. On the police – Okay. We're very familiar with the record here. Thank you so much. Over your time, and we appreciate the argument from both sides. Judge Stallman, I apologize if I go overboard. I get excited. I apologize. Counsel, I appreciate your passion, and I'm sure your clients do as well. I'm sure you're very effective in front of juries. But when you're arguing in front of a court of appeals, you're not arguing to a jury. And my colleague was going to make the argument, but he couldn't be here. All right. Thank you so much, Your Honor. You did a fine job. Thank both sides for good arguments. Korf v. City of Phoenix, now submitted. Nice to meet you all. Thank you.
judges: Hawkins, W. Fletcher, Tallman